Hemstreet v. Greiner

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: November 3, 2006                    Decided: June 20, 2007)

Docket No.  02-2747-pr

_____

CHARLES HEMSTREET,

*Petitioner-Appellee,*

— v.—

CHARLES GREINER,
SUPERINTENDENT

*Respondent-Appellant.*

_____

Before:        MESKILL, SACK, and B.D. PARKER, *Circuit Judges.*

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Brieant, *J.*) granting the petition for a writ of habeas corpus..

REVERSED and REMANDED with instructions to DISMISS the petition.

Judge Meskill dissents in a separate opinion.

_____

MONICA R. JACOBSON, P.C., New York, NY, *for Petitioner-Appellee.*

MICHAEL E. BONGIORNO, DISTRICT ATTORNEY, ROCKLAND COUNTY (Ann C. Sullivan, Special Assistant District Attorney, *of counsel*) New City, NY, *for Respondent-Appellant*.

_____

BARRINGTON D. PARKER, CIRCUIT JUDGE:

Following his murder conviction in New York state court, Petitioner Charles Hemstreet sought a writ of habeas corpus principally on the ground of ineffective assistance of counsel. He claimed that officers investigating the murder had intimidated a potentially exculpatory witness, causing her not to testify at trial, and that counsel had omitted to pursue this issue both at trial and on appeal. Based on these allegations, as well as trial counsel's failure to supply an alternative explanation for not calling the potentially exculpatory witness, the United States District Court for the Southern District of New York (Brieant, *J.*) granted the petition and this Court affirmed. *See Hemstreet v. Greiner*, 367 F.3d 135, 136 (2d Cir. 2004) ("*Hemstreet I*").

Shortly after we issued our opinion, the witness contacted the district attorney's office responsible for prosecuting the case and recanted her potentially exculpatory statements. We then *nostra sponte* vacated our opinion along with the district court's judgment and, retaining jurisdiction, remanded the case to the district court to evaluate the effect of the recantation. *See Hemstreet v. Greiner*, 378 F.3d 265, 268-69 (2d Cir. 2004) ("*Hemstreet II*"); *see also United States v. Jacobson*, 15 F.3d 19, 21-22 (2d Cir. 1994). On remand, the district court, following an evidentiary hearing, adhered to its previous conclusion and, once again, granted the petition. *See Hemstreet v. Greiner*, No. 02 Civ. 1667 (CLB), 2005 WL 3434412 (S.D.N.Y. Oct. 13, 2005)

("*Hemstreet III*").[1] Because we conclude that Hemstreet failed to establish that the state court's resolution of his claim of ineffective assistance of counsel was unreasonable, we reverse and remand to the district court with instructions to dismiss the petition.

**BACKGROUND**

Hemstreet was convicted in January 1998 in New York Supreme Court, County of Rockland of the second-degree murder in 1992 of his business partner, Kenneth Hiep. On direct appeal, Hemstreet's counsel challenged the sufficiency of the evidence supporting the verdict. The Appellate Division affirmed the conviction. *See People v. Hemstreet*, 270 A.D.2d 499 (2d Dep't 2000). Hemstreet petitioned that court for a writ of error *coram nobis* on the ground that he was denied effective assistance of trial and appellate counsel. Specifically, he claimed that appellate counsel had failed to pursue a meritorious ineffective assistance of counsel claim on direct appeal. The claim against trial counsel was based on his failure to seek a remedy for the prosecution's alleged intimidation of a potentially exculpatory defense witness. The Appellate Division denied the petition because Hemstreet had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Hemstreet*, 290 A.D.2d 458, 459 (2d Dep't 2002). Hemstreet then filed the petition for a writ of habeas corpus that underlies this appeal, asserting ineffective assistance of appellate counsel on largely the same grounds.

Hemstreet's petition centers on the alleged intimidation of a potentially exculpatory defense witness, Jeanette Bucci, by officers investigating the Hiep murder. In a June 1997 affidavit prepared and notarized prior to trial by "'an interim attorney of sorts' for Mr.

---

[1] Familiarity with *Hemstreet I*, *II* and *III* is presumed.

3

Hemstreet," *Hemstreet III*, 2005 WL 3434412, at \*4, Bucci swore that on the night of the murder, she had seen Hiep, Hemstreet, and Patrick Bentz (a friend of Hemstreet's who was separately convicted of murdering Hiep) together at a bar where she worked. According to Bucci's affidavit, the three men left the bar at around 9:45 that evening but Hiep and Bentz returned at about 10:30 without Hemstreet. Bucci also stated in her affidavit that in 1992 she had given essentially the same information to investigators from the district attorney's office.

In November 1997 detectives visited Bucci's parents' home, and the following day met with Bucci at her workplace. According to the detectives' notes from that meeting, Bucci gave a statement mostly consistent with her affidavit. She added that despite not seeing Hemstreet in the bar at 10:30, he "could have been there."

If true, Bucci's statements would have supported the defense's theory that Bentz had taken Hemstreet home prior to killing Hiep. However, at trial Hemstreet's attorney informed the court that Bucci was refusing to testify or to meet with him because investigators had visited her mother and sister and warned them that, if Bucci testified, "they were in for a lot of trouble." *See Hemstreet I*, 367 F.3d at 137. Trial counsel did not seek to remedy this alleged intimidation other than by asking the court to stop any future threats. *See id.*

In reviewing Hemstreet's habeas petition, the district court found that this conduct amounted to ineffective assistance of counsel because "'[n]o plausible basis in trial tactics could justify failure to pursue the issue [of Bucci's alleged intimidation] by demanding a hearing in the trial court.'" *Hemstreet I*, 367 F.3d at 138 (quoting the district court's unpublished opinion). Likewise, the court found that "'no tactical decision [could] justify failure to raise the issue on

4

direct appeal.'" *Id*. The court granted the petition. It concluded that Hemstreet's Sixth Amendment rights had been violated and that the Appellate Division's rejection of his ineffective assistance claim was an unreasonable application of clearly established federal law. *See id*.; 28 U.S.C. § 2254(d)(1).

On appeal we concluded that although "[t]he record does not definitively establish whether the prosecution intimidated Bucci," the district court did not clearly err in finding that she "became unavailable as a witness to Hemstreet because she had been threatened by detectives from the prosecutor's office." *Hemstreet I*, 367 F.3d at 139-40. Based on that finding of fact, together with trial counsel's failure to provide any alternative explanation for not calling Bucci as a witness, we concluded that trial counsel's performance fell below an objective standard of reasonableness. *Id*. at 140. We further concluded that this deficient performance affected the outcome of the trial, and that appellate counsel had an obligation to raise the issue on direct appeal. *Id*. at 140-41.

After our opinion was issued, Bucci contacted the Rockland County District Attorney's office and asserted that she had in fact never been intimidated by the detectives. *Hemstreet II*, 378 F.3d at 268. She admitted to having lied in key portions of her 1997 affidavit, and explained that she now "wanted to make it right." *Id*. Based on this recantation, we vacated our earlier decision, and remanded for the district court to reevaluate the case and to allow Hemstreet the opportunity "to flesh out and otherwise examine Bucci's new explanation." *Id*. at 269 (footnote omitted).

On remand, the district court conducted an evidentiary hearing at which several witnesses

5

testified. Hemstreet's trial counsel, Murray Richman, Esq., testified that he met Bucci for the first and only time around the beginning of the defense case, after he had informed the court that she refused to appear. He further testified that at that face-to-face meeting, Bucci confirmed that her family had been visited by detectives and that she would not testify on Hemstreet's behalf. He stated that Bucci "seemed really disturbed, and I didn't want to put a witness on that I did not know what she was going to say." Trial counsel's daughter, who served as co-counsel during the trial, and was present for the meeting, testified that Bucci appeared "genuinely upset."

Bucci offered a starkly different account of this meeting. She testified that trial counsel was accompanied not only by his daughter but by Hemstreet himself. Bucci stated that she spoke privately with counsel and told him she could not testify because she had falsified her affidavit. She explained that on the night of the murder she left work as soon as her shift ended, and thus was not present to witness Hiep and Bentz return to the bar alone, as she had attested. Bucci further denied ever telling counsel or his daughter that the police had threatened her or her family members.

Bucci's mother testified that she did not remember whether or not the police had visited her in 1997, and she did not remember being threatened. Bucci's sister testified that she was not present for the detectives' visit, but that her mother told her that the police had come to her house asking to speak with Jeanette. She stated that her mother gave no indication that the detectives had threatened her. The detectives themselves testified that they only visited Bucci's mother's house in order to locate Bucci herself, and that they never threatened Bucci or her family members. They explained that their conversation with Bucci's mother consisted solely of a brief

6

inquiry as to Bucci's whereabouts.

The district court concluded – given the testimony of Bucci's mother and sister, as well as the detectives who interviewed Bucci in 1997 – that there was not sufficient evidence to support a finding that the police had "actually threatened or intimidated Ms. Bucci or that their conduct would be regarded by a reasonable individual as threatening." *Hemstreet III*, 2005 WL 3434412, at *10. Nevertheless, the district court found that Bucci had "conveyed clearly to Mr. Richman a *feeling* of intimidation, whether or not reasonable." *Id.* (emphasis added).

The court reasoned that the only way it could "justly deny Petitioner's habeas petition is if it were convinced that Bucci's testimony together with her prior exculpatory statements and affidavit [at the time of the trial] could not have raised a reasonable doubt in the minds of the jurors." *Id.* at *13. Applying this standard, the court concluded that even if it were to find Bucci's recantation credible – which it did not – trial counsel acted unreasonably in failing to compel her testimony based on what he knew at the time. *See id.* at *10, *15.

The court further concluded that trial counsel's deficient performance prejudiced Hemstreet, since "Bucci's exculpatory testimony, even with a possible recantation . . . likely would have raised a reasonable doubt" in the minds of the jury. *Id.* at *16. The court found that the outcome of Hemstreet's direct appeal likely would have been different had appellate counsel raised the issue of trial counsel's ineffectiveness. *See id.* at *17.

**DISCUSSION**

I. Standards of Review

We review a district court's decision to grant or deny a habeas petition *de novo* and its

7

findings of fact for clear error. *Policano v. Herbert*, 430 F.3d 82, 87 (2d Cir. 2005); *Gersten v. Senkowski*, 426 F.3d 588, 606 (2d Cir. 2005).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a habeas petition based on a claim that was adjudicated on the merits in state court where such adjudication "resulted in a decision that . . . involved an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003). The Appellate Division's rejection of Hemstreet's *coram nobis* petition on the grounds that Hemstreet had "failed to establish that he was denied the effective assistance of appellate counsel," *People v. Hemstreet*, 290 A.D.2d at 459, represents an adjudication on the merits for purposes of § 2255(d). *See Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir. 2006); *Jimenez v. Walker*, 458 F.3d 130, 141 (2d Cir. 2006).

Hemstreet's ineffective assistance claim, moreover, "necessarily invokes federal law that has been 'clearly established' by the Supreme Court within the meaning of AEDPA." *Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001). The Supreme Court set forth the test for such claims in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel under *Strickland*, Hemstreet must demonstrate (1) that his counsel's performance was deficient, and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The first component "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The second requires "a reasonable probability that, but for counsel's unprofessional errors, the

8

result of the proceeding would have been different." *Id*. at 694.

To establish eligibility for habeas relief under AEDPA's deferential standard, Hemstreet must demonstrate that the Appellate Division's application of *Strickland* was not merely incorrect, but "'objectively unreasonable.'" *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). An objectively unreasonable application involves "[s]ome increment of incorrectness beyond error." *Sellan*, 261 F.3d at 315 (internal quotation marks omitted).

## II. Merits

The district court summarily concluded that the Appellate Division's denial of Hemstreet's *coram nobis* petition was an unreasonable application of *Strickland* because "the trial and direct appeal could not reasonably be relied upon as having produced a just result." *Hemstreet III*, 2005 WL 3434412, at *17. Although the district court adverted to AEDPA's deferential standard of review, we are not persuaded that it was correctly applied. We need not determine conclusively whether the district court misapplied AEDPA because we find that Hemstreet failed to carry the less stringent, though still weighty, burden of proving that he received ineffective assistance of counsel. *See, e.g.*, *Greiner v. Wells*, 417 F.3d 305, 317 (2d Cir. 2005) (noting that because petitioner's ineffective assistance claim fails, "[w]e need not consider the propriety of the [district court's] other conclusions – including [its] application of the heightened AEDPA deference of 28 U.S.C. § 2254(d)"); *cf. Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003) (observing that "the heavy burden of showing ineffective assistance" is "enhanced by the added hurdle posed by the highly deferential review accorded state court adjudications

under [AEDPA]" (citations omitted)).  Because Hemstreet cannot demonstrate ineffective assistance under *Strickland*, it follows that he cannot demonstrate that the Appellate Division's denial of his petition was an unreasonable application of clearly established federal law.[2]

Under *Strickland*, we "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Kurti*, 427 F.3d 159, 163 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689).  A principal basis for the district court's original decision to grant Hemstreet's petition, as well as for this Court's now-vacated affirmance of that decision, was "trial counsel's failure to seek relief for the intimidation of Bucci, a crucial defense witness."  *Hemstreet I*, 367 F.3d at 138.  But on remand the district court found insufficient evidence to conclude that Bucci actually had been intimidated, and also found that a reasonable person would not have perceived the detectives' condut to be intimidating. *Hemstreet III*, 2005 WL 3434412, at *10.

We believe that these findings, in and of themselves, largely eviscerate Hemstreet's ineffective assistance claim.  Nonetheless, the district court relied on Bucci's allegedly having conveyed to trial counsel a subjective feeling of intimidation, "whether or not reasonable," in concluding that counsel had acted unreasonably by failing to pursue the issue. *See id.* at *10-11.

---

[2]The inverse, of course, would not hold true.  Even if we were to conclude that the Appellate Division had erred in denying Hemstreet's *coram nobis* petition, and that he had presented a colorable claim under *Strickland*, AEDPA would nevertheless require us to defer to the state court's determination unless it was objectively unreasonable. *See, e.g.*, *Sellan*, 261 F.3d at 317 ("Were we to consider [the Appellate Division's] decision under a pre-AEDPA *de novo* level of deference we might find error. . . . But [petitioner's] claim was not so strong that it was unreasonable for the coram nobis court to conclude that appellate counsel's position was within the bounds of professional conduct under *Strickland*.").

To reach that conclusion the district court curiously dismissed, as "entitled to little or no weight," *id*. at \*11, the more direct explanation trial counsel offered for why he decided not to pursue Bucci's testimony more aggressively – namely, that he feared her testimony might not be favorable to Hemstreet. Instead, the district court relied on trial counsel's 2002 *Sparman* affidavit, in which he offered no explanation at all for not calling Bucci as a witness, along with his representation to the trial court that Bucci told him that she had been intimidated.[3] *See id*.; *see also Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam). We previously found this evidence, however inconclusive, sufficient to support a claim of ineffective assistance. *Hemstreet I*, 367 F.3d at 140. But after our remand our understanding of the circumstances surrounding counsel's decisions at trial has become more complete. Once we accept the district court's conclusion that there was no evidence that Bucci had actually been intimidated, we are hard-pressed to understand how trial counsel could be faulted for not pursuing the issue.

Although we do not believe trial counsel's performance was deficient, we are not required to resolve that issue. Even assuming such deficiency, the record does not show that Hemstreet suffered prejudice from any alleged omissions by his counsel. We therefore conclude that Hemstreet cannot satisfy the *Strickland* standard as to the assistance he received at trial. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient

---

[3]At the hearing before Judge Brieant, Richman contradicted his earlier statement to the trial court by testifying that he had in fact not spoken personally with Bucci when he represented to the trial court that she had been intimidated by the detectives. *See Hemstreet III*, 2005 WL 3434412, at \*5.

showing on one."). Hemstreet's inability to make this showing means that he also cannot demonstrate that his appellate counsel had any obligation to raise the issue of trial counsel's ineffectiveness on direct appeal.

Even though Bucci was not actually intimidated, even though it was unclear what her testimony would have added to Hemstreet's defense, and even though calling her was, in counsel's view, risky, the district court concluded that Hemstreet was prejudiced because trial counsel should have, but failed to, compel the testimony of this "crucial alibi witness." *Hemstreet III*, 2005 WL 3434412, at *3; *see id*. at *16. Specifically, the court found that in light of Bucci's affidavit, along with her contemporaneous consistent statements to the police, "[t]he actual innocence of Mr. Hemstreet cannot be ruled out." *Id*. Because we disagree that Bucci's testimony would have been sufficiently probative to alter the outcome of the trial, we cannot conclude that Hemstreet suffered prejudice as a result of her not being called to testify. Unlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice "may be made with the benefit of hindsight." *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

Since Bucci offered different versions of the salient events at different times, no one – particularly trial counsel – can say with any confidence what her testimony would have been. But assuming Bucci would have testified at trial consistently with her affidavit and the statement she gave to detectives in November 1997, her testimony would have contradicted the sequence of events on the night of the murder established by three other witnesses, as well as by Hemstreet himself.

12

Bucci stated in her affidavit that she saw Hiep, Bentz, and Hemstreet enter the Lace bar, where she worked, at around 6:00 PM, and saw the three men leave together around 9:45 PM. Bucci further stated that at approximately 10:30 PM she saw Bentz and Hiep walk back into the bar, without Hemstreet. At 10:45 PM, she left the bar and went home.

Bucci made no mention in her affidavit or to the police of a fourth member of the party, Joseph Patta, who according to other witnesses arrived at the bar that night with Hemstreet, Hiep, and Bentz. Nor did she mention that Hiep's son, Kenneth Hiep, Jr., and another man, Irv Kiegler, eventually joined the party. According to Hiep, Jr., he and Kiegler arrived at the bar around 4:30 or 5:30 PM, and the others were already there. Bucci's account also conflicts with that of two other witnesses who testified they saw Bentz, Hemstreet, and Hiep, Sr. arrive at another local bar at around 8:30 PM – an hour prior to the time Bucci allegedly saw them leave Lace. Most importantly, Hemstreet himself told both Hiep, Jr. and the police that he and Bentz together dropped Hiep, Sr. off at home between 11 and 11:30 PM – *after* Bucci said she saw Bentz and Hiep, Sr. return alone to the Lace bar, and also after Bucci said she herself had gone home.

While Bucci's testimony would have suffered from these substantial weaknesses, the prosecution's case against Hemstreet was independently strong. The trial testimony established that Hemstreet arguably confessed to murdering Hiep to two separate individuals on two separate occasions. He told the first, "I did it" and that he had "made his bones" with Hiep. He told another witness that "it was a contract hit," and that two men who had allegedly ordered the murder "owed him big time." The prosecution also established that Hemstreet had a plausible

13

motive: allegedly he told one witness, prior to the murder, that he was angry at Hiep for stealing a substantial amount of money from the trash-hauling business they jointly owned. On the day of the murder, the same witness observed Hemstreet and Hiep engaged in a heated argument.

In addition, significant circumstantial evidence implicated Hemstreet in the murder. The day after the murder, multiple witnesses observed Hemstreet with fresh cuts on his hands, for which he offered evasive and inconsistent explanations. Hemstreet tried to dissuade Hiep, Jr. from calling the police to report his father's disappearance. And though the district court acknowledged that "[o]verwhelming items of forensic evidence connected Bentz to the murder," *Hemstreet III*, 2005 WL 3434412, at *1, much of the same evidence – including Hiep's blood in Hemstreet's car – also implicated Hemstreet.

In light of this evidence, we are not prepared to conclude there was a reasonable likelihood that the testimony of a witness of questionable veracity, who, at best, would have offered a version of events that was inconsistent with that established by multiple other witnesses, would have changed the outcome of the trial. *Cf. Strickland*, 466 U.S. at 694. It is even less likely that, but for appellate counsel's failure to raise the issue of trial counsel's ineffectiveness, Hemstreet's direct appeal would have achieved a different result. We therefore conclude that Hemstreet did not suffer prejudice under *Strickland* as a consequence of trial counsel's failure to call Bucci. It necessarily follows that the state court's denial of Hemstreet's *coram nobis* petition was not an unreasonable application of clearly established federal law.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED, and the case

14

is REMANDED to the district court with instructions to DISMISS the petition.

Hemstreet v. Greiner #02-2747

MESKILL, Circuit Judge, dissenting:

I respectfully dissent.

The majority opinion holds that Charles Hemstreet's (Hemstreet) petition for a writ of habeas corpus must be denied because "the record does not show that Hemstreet suffered prejudice from any alleged omissions by his counsel." The majority marshals the evidence of Hemstreet's guilt as if the sufficiency of the evidence, considered in light of Jeanette Bucci's (Bucci) recantation of her June 1997 affidavit, was the reason we remanded this case to the district court. However, earlier when we considered the original grant of the writ petition, we noted the weakness of the prosecution's case against Hemstreet and "agree[d] with the district court that trial counsel's deficient conduct affected the outcome of Hemstreet's trial." Hemstreet v. Greiner, 367 F.3d 135, 140 (2d Cir. 2004) (Hemstreet I). Later, alerted to Bucci's apparent recantation, we remanded with instructions for the district court to "evaluate the effect of Bucci's new information on Hemstreet's habeas petition while at the same time allowing Hemstreet an opportunity, by whatever means it thinks appropriate, to flesh out and otherwise examine Bucci's new explanation." Hemstreet v.

16

*Greiner*, 378 F.3d 265, 269 (2d Cir. 2004) (*Hemstreet II*).[1]

Judge Brieant did exactly what we directed him to do. He held evidentiary hearings over a two-day period, taking testimony from all ten witnesses involved in defense counsel Murray Richman's (Richman) decision not to call Bucci as an alibi witness. *See Hemstreet* v. *Greiner*, 2005 WL 3434412, at *3 (S.D.N.Y. Oct. 13, 2005) (*Hemstreet III*). We review the district court's findings of fact concerning a habeas petition for "clear error," *see* *Taveras* v. *Smith*, 463 F.3d 141, 146 (2d Cir. 2006). Based on this record, the district court should not be faulted for crediting some but not all of the testimony. For example, Richman declared in his 2002 *Sparman* affidavit that he could not "with any degree of certainty assert why Ms. Bucci was not called as a witness during the course of the trial." Judge Brieant understandably was unconvinced by Richman's refreshed recollection during the proceedings on remand -- testimony that rationalized a decision defense counsel made more than seven years earlier. Judge Brieant also had good reason to question the truthfulness of Bucci's recantation. She waited more than

---

[1] We clarified that "[w]e do not mean to suggest that the district court is limited to this inquiry on remand. In addition to any proceedings necessary in light of Bucci's new information, the district court is free to accept or solicit any other information that bears on the resolution of Hemstreet's habeas petition." *Hemstreet II*, 378 F.3d at 269 n.1.

17

seven years to contact the Rockland County District Attorney's office to claim that her June 1997 affidavit was false. Had I been the district court judge considering this case on remand, I might have reached different conclusions from Judge Brieant regarding the credibility of the witnesses and their accounts of Bucci's fears and Richman's decision not to call her as a witness. However, I was not the district judge on remand. On this cold record I cannot say that the district court's factual findings are clearly erroneous.

The majority does not appear inclined to disturb these factual findings either. Nonetheless, in reversing the district court, the majority considers other evidence of Hemstreet's guilt, evidence we believed in Hemstreet I so flimsy that the conduct of defense counsel likely prejudiced Hemstreet. Somehow to the majority that evidence is now strong enough to preclude prejudice to the defense from Bucci's failure to testify.[2] I recognize that Hemstreet II vacated Hemstreet I and that this panel is not bound to follow our initial analysis of prejudice

---

[2] Judge James L. Oakes authored Hemstreet I, 367 F.3d at 136, with Judge Parker dissenting. When Judge Oakes retired after the remand, Judge Sack replaced Judge Oakes on this panel. Our earlier decision was vacated, Hemstreet II, 378 F.3d at 269. I am not suggesting that any member of this panel should be bound by the views expressed in Hemstreet I, but rather to suggest that successive panels reviewing essentially the same record should reach the same result.

under the second prong of Strickland v. Washington, 466 U.S. 668 (1984). Nonetheless, I believe that Hemstreet I correctly concluded that the prosecution's largely circumstantial case against Hemstreet was far from overwhelming. We observed that the prosecution's strongest evidence against Hemstreet was that the victim, Kenneth Hiep (Hiep) was last seen in the company of both Patrick Bentz (Bentz), who was separately convicted for the murder, and Hemstreet, and that no one saw Bentz and Hiep alone that night. See Hemstreet I, 367 F.3d at 141. Yet Bucci's June 1997 affidavit stated that "[a]t about 10:30 pm [on the night of the murder] I noticed Mr. Bentz and Mr. Hiep walk into Lace. Mr. Hempstreet [sic] was not with them."[3] The majority observes that other witnesses provided a different timeline of that night's events, and that Bucci's account failed to mention others who joined the party that night. Admittedly this evidence bears on Bucci's credibility. However, that credibility is a question the jury should have been permitted to assess. Bucci's 1997 affidavit was exculpatory and directly challenged the prosecution's theory of the case, a case that was built largely on circumstantial evidence.

Finally, although the majority does not rest its

---

[3] The majority assumes that Bucci would have testified at trial in conformity with the June 1997 affidavit and her November 1997 statement to detectives.

19

holding on the first prong of Strickland, it concludes that trial counsel's performance was not deficient. I disagree with their conclusion that the district court's findings on remand "largely eviscerate Hemstreet's ineffective assistance claim." Strickland emphasizes that, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689 (emphasis added). Although the district court ultimately concluded that "there is insufficient evidence to conclude Detectives Murphy and Hill actually threatened or intimidated Ms. Bucci or that their conduct would be regarded by a reasonable individual as threatening," Judge Brieant nonetheless found that "Bucci conveyed clearly to Mr. Richman a feeling of intimidation, whether or not reasonable." Hemstreet III, 2005 WL 3434412, at *10. Regardless of its objective basis, it was Bucci's actual fear that is crucial to assessing Richman's diligence in pursuing Hemstreet's defense. Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Strickland, 466 U.S. at 690, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

20

unnecessary." Id. at 691. Judge Brieant found that Richman did neither. That finding is not clearly erroneous. Counsel's decision not to call Bucci as a potential alibi witness is not entitled to deference because he made little effort to discover the source of Bucci's fear and how any potentially exculpatory testimony might be salvaged.

In conclusion, I believe that on remand the district court did exactly what we instructed it to do. The majority, however, faults him for this and reweighs the evidence of prejudice to the defense that the majority of our original panel found troubling. I adhere to my earlier analysis of the prejudice prong of Strickland, and believe that the district court committed no error of law in its analysis.

Therefore, I dissent from the majority and would affirm the district court's issuance of the writ of habeas corpus.