17-78-pr
*Garner v. Lee*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2017

(Argued: January 3, 2018          Decided: November 15, 2018)

No. 17-78-pr

_____

BLAIR GARNER,

*Petitioner-Appellee,*

-v.-

WILLIAM LEE, as Superintendent of Greenhaven Correctional Facility,

*Respondent-Appellant.*

_____

Before:     RAGGI, LIVINGSTON, and LOHIER, *Circuit Judges.*

Respondent-Appellant William Lee appeals from the judgment of the United States District Court for the Eastern District of New York (Chen, *J.*) granting Petitioner-Appellee Blair Garner's petition for a writ of habeas corpus based on ineffective assistance of counsel.   Having carefully reviewed the state court and district court records, we conclude that, given the strong evidence of Garner's guilt, he has not shown that his defense was constitutionally prejudiced by trial counsel's conduct.   Accordingly, we VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

FOR PETITIONER-APPELLEE:        NORMAN TRABULUS, Law Office of Norman Trabulus, New York, New York

FOR RESPONDENT-APPELLANT:      MICHAEL J. MILLER, *pro bono publico*, *for* Timothy D. Sini, District Attorney of Suffolk County, Riverhead, New York

DEBRA ANN LIVINGSTON, *Circuit Judge*:

One night in April 2002, Karl Keith ("Keith"), a 20-year-old student at Westchester Community College who lived with his parents, and Jesse Merkelson ("Merkelson"), his cousin and a 23-year-old college student at Carnegie Mellon University, met in a parking lot with Petitioner-Appellee Blair Garner ("Garner") for the purpose of purchasing ecstasy and cocaine. Within a few hours, Keith had been robbed of thousands of dollars, shot in the head, and left to die in a pool of his own blood in the middle of an unlit, deserted street in North Amityville, New York. Keith thought that he would bleed to death but, remarkably, he survived. Thinking that he was going to die, he told the first responding police officer what he could: namely, he had been shot by Garner, a supposed friend whose wedding he had attended. In a stroke of luck, while the police officer was trying to learn as much as he could about Garner, Garner called Keith and told the police officer (who answered Keith's phone) that he was "on the parkway[,]" Trial Tr. 317, 331,

a damning contemporaneous statement that obliterated Garner's alibi (both at trial and still today) that he was at home at the time of the shooting.

At Garner's workplace the next day, a supervising police officer clandestinely observed him on the phone "speaking in urgent tones" and "pleading to the party on the other end." *Id.* at 655. Garner's behavior suggested to the supervising officer that Garner "was about to leave [the] building" and that he was "about to leave the Long Island area." *Id.* Three police officers promptly arrested Garner, recovering (1) thousands of dollars of cash from his car that Garner does not dispute had been placed there temporarily by Keith not long before he was shot, and (2) a portfolio full of collection notices for unpaid bills.

At trial, Keith's account of the night in question was substantially corroborated by the physical evidence and by the testimony of many other witnesses—including Merkelson, who had been with Keith for many of the key events, and several police officers. In contrast, Garner took the stand in his own defense, claiming incredibly, and without corroboration, to have been home during the relevant period.

3

Unsurprisingly, given the prosecution's strong evidence, the jury found Garner guilty of all five counts, including attempted murder, assault, and robbery, after deliberating for only two or three hours. The trial court imposed the maximum sentence and twice described the evidence of Garner's guilt as "overwhelming." Nov. 21, 2002 Sentencing Tr. at 18; Oct. 12, 2006 Resentencing Tr. at 18. Garner variously filed a direct appeal, petition for a writ of error *coram nobis*, and collateral attack in state court. All failed. In Garner's state collateral attack, he alleged that his trial counsel—who, like Keith, attended Garner's wedding and who had also represented him successfully during a 1997 double murder trial—was constitutionally ineffective. This claim was denied without a hearing. Garner next filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. The district court (Chen, *J.*) granted Garner's petition, determining that trial counsel's conduct with respect to certain phone records—including counsel's failure to obtain the records before trial and to object to their admission at trial—constituted prejudicially deficient performance.

We vacate the district court's judgment and remand for further proceedings consistent with this opinion. To establish an ineffective assistance of counsel

4

claim under *Strickland v. Washington*, 466 U.S. 688 (1984), the likelihood of a different result in the absence of the alleged deficiencies in representation "must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *see also Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). Having carefully reviewed the state court and district court proceedings, we conclude that, given the strong evidence of Garner's guilt, he has not shown that his defense was constitutionally prejudiced by trial counsel's conduct even assuming, *arguendo*, that it was deficient. The district court accordingly erred in granting Garner's petition.

## BACKGROUND

### I. Factual Background[1]

Garner's jury trial commenced on October 18, 2002. He stood trial for five counts: (1) attempted murder in the second degree (Count One); (2) assault in the first degree (Count Two); (3) robbery in the first degree (Count Three); (4) criminal

---

[1] The factual background presented here is derived principally from the trial transcript and otherwise reflects information in the state court and district court records.

use of a firearm in the first degree (Count Four); and (5) criminal possession of a weapon in the second degree (Count Five).

**A. The Prosecution's Case**

During the prosecution's case in chief, Keith testified that he met Garner through a mutual friend, Michael Waring ("Waring"), Keith's former high school classmate, who worked at the Hempstead car dealership where Garner also worked at the time. As of April 13, 2002, the day of the crime, Keith had known Garner, who he sometimes called "Blizzie" or "Bliz," for about a year and a half. Before the crime, Keith thought that he knew Garner well, having been in contact with him on essentially a daily basis, attended Garner's wedding, and helped Garner paint his fence.

During April 2002, Keith asked Garner if he could help Keith obtain 2,000 pills of ecstasy for his cousin, Merkelson, and two ounces of cocaine for himself. Neither Keith nor Merkelson had ever participated in a large drug purchase of this sort before, nor had either ever been convicted of a crime. But Keith and his cousin had a plan to sell these drugs for a profit. After some back and forth, it was agreed that Merkelson would pay $8,000 for the ecstasy and also front $1,700 to his cousin for the cocaine, with Keith, whose life was "hectic" during this period,

6

Trial Tr. 466, promising to pay back the $1,700 once Keith had sold the cocaine at

Carnegie Mellon, Merkelson's school. Garner agreed to arrange for the purchase.

As of the day before the crime, Keith's understanding was that he and Merkelson

were supposed to go with Garner to buy the drugs, but Keith had no idea where

or from whom.

On April 13, 2002, the day of the crime, Garner told Keith that he was

coming straight from work and asked Keith if he had the money; Keith replied in

the affirmative. Keith testified that the money he brought with him to purchase

the drugs was divided into thousand-dollar segments, with each thousand dollar

segment separately rubber-banded, the $1,700 for the cocaine separately rubber-

banded, and a few rubber bands around the whole $9,700. This testimony was

corroborated by Merkelson, who testified at trial that he counted the bills in

preparation for the purchase, "rubber-band[ed] it up, and then . . . double-

check[ed] . . . to make sure that all the bunches were correct." *Id.* at 351.

Merkelson used beige, red, and blue rubber bands.

Garner instructed Keith that he should meet him at a McDonald's parking

lot in Long Island. Keith estimated that he and Merkelson met Garner there at

around 9:15 p.m.[2]   Garner was driving a blue-green car.   Initially, Keith alone entered Garner's car and spoke to Garner.   Then, Merkelson, who had never met Garner, came over and was introduced.   Merkelson testified at trial that Garner "appeared somewhat older than us, than like me and my cousin, and that kind of gave me a little bit of a start. . . . because what was this older guy doing hanging out with my cousin?"   *Id.* at 363.   Garner, who was wearing glasses, "seemed very cold and he didn't . . . talk much at all."   *Id.*   Garner had told Keith as Merkelson approached that it would be better if just Keith (and not Merkelson) was present when they went to buy the drugs.   Garner said that he had to go home and change out of his business suit, and directed Keith to meet at a second parking lot, near a Home Depot on Long Island.   When advised of the change in plans, Merkelson told Keith that he "didn't think [the change] was such a good idea."   *Id.* at 481.   Keith reassured Merkelson that he had known Garner "for a long time," and that he "d[id]n't think [Garner would] do anything."   *Id.*

Keith and Merkelson proceeded to the second parking lot near the Home Depot.   Keith had the money that Merkelson had provided.   They arrived before

---

[2] Keith and Merkelson were driven to the parking lot by Ryan Palmera, a friend of Merkelson's.

8

Garner. Keith, who testified that he often spoke to Garner using the walkie-talkie function on his Nextel phone, spoke to him repeatedly that evening while waiting in the parking lot. Instead of driving to where Keith was parked, however, Garner called Keith and told him to find Garner's car near the Home Depot entrance. Keith left his cousin behind and found Garner, who was now driving a dark red car (a different car than the car that Garner was driving in the first parking lot near the McDonald's).[3] For his part, Merkelson did not see or converse with Garner in the second parking lot, but he testified that Keith was in "pretty much constant contact" with Garner through the walkie-talkie function on Keith's Nextel phone, and there was "no question in [Merkelson's] mind" that Keith would be meeting Garner in the second parking lot. *Id.* at 398. At the conclusion of these walkie-talkie exchanges, Keith left to join Garner, and Merkelson observed Keith get into a car with a solo driver and depart.

Keith testified that he entered the passenger side of Garner's car at about 10:00 p.m. and that Garner then drove to North Amityville. During the drive, Keith could not recall Garner making or receiving any phone calls. Keith testified

---

[3] Over the course of their acquaintanceship, Keith had observed Garner drive many different dealership cars, often switching their license plates as he shifted from one to another.

that he was nervous because he had never before carried so much money or been involved in a large drug buy. But Garner reassured him, telling Keith that he knew the sellers "pretty well" and, regardless, that Garner "would protect" him because he knew him better than the sellers. *Id.* at 488. While on the road, Keith remembered discussing a third party that Keith had met through Garner; Garner told Keith that he had asked this third party "to kill a kid for money." *Id.* at 487. Keith observed that there were no people on the street and no cars passing.

They arrived at the North Amityville destination about 20 minutes later. Keith had never been to this location before. Upon arrival, Garner told Keith to put the money in the glove box. Keith complied, putting all $9,700 in the otherwise empty glove box. Keith understood that they were supposed to go to an unspecified house and, if the drugs were satisfactory, then retrieve the money from the parked car's glove box.

Keith and Garner exited the car; Garner walked toward and slightly past the back of the car along the driver's side, and Keith walked—parallel to Garner but along the passenger side—also toward and slightly past the back of the car. Garner was in Keith's peripheral vision. They were not speaking to each other. As Keith took a step closer to Garner as he passed the car's rear, Garner

momentarily "dropped out of [Keith's] sight" which "was weird because he was supposed to be leading the way." *Id.* at 502. Keith paused, sensing that Garner had dropped a step or two behind him. Suddenly, Keith was shot behind his right ear by the center of his neck. During this entire period before the crime, Keith neither saw nor heard anyone besides Garner in his vicinity. The prosecution estimated that the shooting occurred at or before 10:25 p.m.

Keith later woke up on the ground, not knowing how long he had been unconscious. When he came to, Keith realized that he had been shot and "couldn't move at all." *Id.* at 506. Lying on the ground, Keith heard Garner call in a loud whisper "Yo, Dread, Yo, Dread"—"Dread" being Garner's nickname for Keith. *Id.* at 508. Garner was not asking if Keith was okay or if he needed help. Keith played dead; he closed his eyes, held his breath, did not move at all, and prayed. He played dead because he "thought [Garner] would come back and finish [him] off if [Garner] knew [he] was alive." *Id.* It worked; Garner left.

Keith recalled that "[n]othing right away" happened after Garner left. *Id.* Though he tried, he could not move his arms, so he was unable to call 911. Keith's cell phone rang multiple times but, again, he was unable to move his arms to grab

11

his phone, much less answer any of the calls.[4]   Keith later heard people talking

about calling 911 and he asked them to "[g]et an ambulance."   *Id.* at 509.

Two different individuals later placed two separate 911 calls, with the earlier

of the two calls (played for the jury) occurring at approximately 10:40 p.m.

Officer Brian Gover ("Officer Gover"), with the Suffolk County Police Department,

received a call at about 10:44 p.m. to respond to the scene.   He testified that he

arrived around 10:52 p.m.   Officer Gover explained that the street where Keith

was shot was a fenced, densely-wooded area, with "all sorts of thickets and sticks

and branches as well as bushes," *id.* at 321, located in a "fairly quiet residential

community" in North Amityville, *id.* at 301.   The officer testified that the specific

area where Keith was shot is "completely dark," there is "no direct lighting."   *Id.*

at 320.   When he arrived, Officer Gover saw Keith lying in the roadway about five

feet from the curb.   There were a small number of civilians in the general area but

not directly near Keith's body.

Officer Gover explained that he wanted to assess Keith's level of

consciousness, so he asked Keith basic questions such as his name and date of

---

[4] Merkelson testified that he called Keith that evening when Keith failed to return
to the second parking lot as promised.   He received no answer and learned only the next
day from another family member that Keith had been shot.

12

birth, which Keith answered without any difficulty. Officer Gover described Keith as "very somber" and "a little nervous"; he noted that Keith's voice "quivered a little." *Id.* at 308. Keith asked several times "if he was gonna make it" and "if somebody could notify his parents." *Id.* Officer Gover noted that he memorialized Keith's comments because, based on his experience, "the amount of blood loss, and the fact that the victim could not move his body in any way, from listening to his voice, just his whole demeanor, I was very worried, I really thought he was gonna die on me." *Id.* at 313.

Keith testified that he "immediately" told the police "[e]verything [he] could," *id.* at 509, because he "thought [he] was gonna die. [He] wanted to make sure that the person who shot [him] got caught[,]" *id.* at 511. Officer Gover testified that Keith did not hesitate in any way when describing what had happened, and that he was "very alert, very attentive," *id.* at 326, and "very coherent," *id*. at 327. Among other things, Keith told Officer Gover: that he met Garner through his friend, Waring, about two years ago; that Keith had come to North Amityville with Garner who was "gonna hook him up with someone to buy drugs," *id.* at 311; that he had just been shot by Garner, who had the nickname "Blizzie"; that Keith had left the money for the deal in the glove box of the car

Garner was driving, at Garner's instruction; that Garner was over six feet tall and weighed roughly 210 to 220 pounds; that he had several tattoos including a flower on his neck, his name on his arm, his wife's name on his calf, and a heart on his wrist; and that he then worked at a Five Towns car dealership.

According to both Keith and Officer Gover, Keith's cell phone rang about this time. Officer Gover estimated that Keith's cell phone went off between five and 10 minutes after Officer Gover's 10:52 p.m. arrival. Officer Gover grabbed Keith's ringing phone and showed Keith the caller ID display, which indicated that "Blizzie" was calling. Keith confirmed that Blizzie, his nickname for Garner, was "the person that just shot me." *Id.* at 512. Officer Gover answered the phone, but did not identify himself as a police officer. Officer Gover asked who the caller was, but Garner did not identify himself. When he asked where the caller was, however, Garner responded "I'm on the parkway" and then hung up.[5] *Id.* at 317, 331. Officer Gover then told a police dispatcher to alert officers within the county and in adjacent counties that Garner, an attempted murder suspect, was on the parkway in a red car.

---

[5] Garner does not dispute that he was the person who called, but testified at trial and maintains to this day that he was at home when he made this call.

Detective Patrick Walsh ("Detective Walsh"), the lead detective investigating Keith's shooting, arrived at the scene at about 11:09 p.m., after an ambulance had arrived. He accompanied Keith during the drive to the hospital. Keith testified that he relayed the same information to Detective Walsh that he had communicated to Officer Gover, and Detective Walsh corroborated that Keith told him that Garner had committed the shooting. Detective Walsh testified that Keith "was extremely pale, but he was conscious and alert." *Id.* at 541. He was also forthcoming. Keith told him, among other information: his name; that Garner shot him for drug money; that he had known Garner for almost two years; that Garner lived in south Freeport; and that Garner had driven him to the site of the shooting in Garner's car. Keith arrived and was treated at Brunswick Hospital before being airlifted and treated at Stony Brook University Hospital ("Stony Brook"), where he was put into a coma to stop bleeding and swelling in his brain.[6]

---

[6] Keith did not recall much from his first three or four days in the hospital, noting that he would "wake up for a minute or so . . . and then basically go back to sleep." Trial Tr. at 516. He did remember making another statement, on April 19, 2002, to Detective Walsh, who was accompanied by his partner, Detective James Faughnan ("Detective Faughnan"). Detectives Walsh and Faughnan confirmed at trial that they interviewed Keith on April 19 and that he was "coherent," answered questions, and spoke "clearly" at that time. *Id.* at 585. Keith remained at Stony Brook until May, after which he spent

15

Detective Walsh and his partner, Detective Faughnan, obtained a photograph, phone number, and home address for Garner. By around 1:40 a.m., they had arrived at Garner's home, where they observed a red car in the driveway. For safety reasons, the detectives did not approach Garner's home that night. Instead, leaving officers behind to keep an eye on the situation, Detectives Walsh and Faughnan met with their supervisor, Detective-Sergeant Kenneth Williams ("Detective-Sergeant Williams"), early on the morning of April 14 to strategize Garner's arrest. They eventually converged on the Five Towns car dealership where Garner worked.

Detective-Sergeant Williams went alone into the dealership. He recognized Garner, who was talking on a desk telephone. Rather than introduce himself, Detective-Sergeant Williams instead "moved as close as [he] could to [Garner], appearing to be a customer just car shopping, and got close enough to hear what he was saying." *Id.* at 654. Detective-Sergeant Williams testified that Garner "was speaking in urgent tones" and "seemed to be pleading to the party on the other end." *Id.* at 655. Detective-Sergeant Williams added that Garner's

---

time in a rehabilitation facility before commencing intensive outpatient therapy after discharge. He testified at trial about six months after he was shot.

16

statements during that call, "along with his demeanor," made it "apparent" to Detective-Sergeant Williams that Garner "was about to leave [the] building" and "was about to leave the Long Island area" as well. *Id.* Detective-Sergeant Williams rushed back outside to gather Detectives Walsh and Faughnan and told them that they "had to get back inside and arrest [Garner] as soon as possible. . . . [Garner's] getting out of here." *Id.*

At approximately 4:40 p.m. (between 18 and 19 hours after Keith's shooting), Detective Walsh, Detective Faughnan, and Detective-Sergeant Williams entered the Five Towns car dealership and arrested Garner. Detective Walsh affirmed that Garner "never expressed any interest in why he was being arrested" and "never asked . . . who he was accused of shooting." *Id.* at 638. During a pat down as Garner was being placed in the back seat of a police car, a key for the car that Garner drove to work that day—a blue-green car with a dealer license plate— was recovered from his person. The car was seized as evidence and impounded.

After executing a search warrant on Garner's blue-green car, Detectives Walsh and Faughnan recovered from the glove box (and photographed) a large sum of money wrapped in red, blue, and beige rubber bands: $6,300.[7] Detective

_____

[7] At trial, Merkelson repeatedly identified various photographs of the rubber-banded money, pointing out that there were thousand-dollar batches wrapped with red,

17

Walsh admitted that he "didn't expect to find any money wrapped in rubber bands in the glove box of that blue [car]," and that so finding was "a bonus." *Id.* at 640. Additionally, at the time of his arrest, Garner had $1,140 in cash not wrapped in rubber bands on his person, which was invoiced as evidence at the precinct. The police officers deemed these funds to be "proceeds from the robbery." *Id.* at 704. When Garner was arrested, the detectives further found a black leather folding portfolio with a zipper around it—and a strap, similar to a handbag—on Garner's person. The portfolio contained personal papers, revealing, as Detective Faughnan testified, "[a] lot of creditors looking for monies" or "[c]ollection type notices." *Id.* at 705.

While at the precinct, Garner called his wife and, 15 minutes later, received a call from an attorney who had represented him successfully in the past and would represent Garner at trial. At the precinct, Detective Walsh asked basic pedigree questions, and observed that Garner wore eyeglasses and had several tattoos, which corroborated Keith's description.

---

blue, and beige rubber bands. He confirmed that "[t]hese are the same rubber bands that I had tied around this money seven months ago. I remember it very vividly." *Id.* at 357. He further noted that "the particular way that I bundled it I think is pretty unique and pretty easily identifiable." *Id.*

18

## B. The Defense Case

The defense case at trial consisted solely of Garner's testimony. Garner concurred in much of the prosecution's case, admitting that he met Keith through Waring, a mutual friend, that they hung out together, and that Keith had attended his wedding. He agreed that in April 2002, Keith asked him if he could help Keith find some ecstasy, cocaine, and "maybe" some marijuana. *Id.* at 786. But Garner contended that he gave Keith the number of someone who could help "and that was it." *Id.* at 787.

As to the drug dealer's identity, the entirety of Garner's testimony on direct examination was the following:

> Well, it's a guy that comes to the dealership on weekends, and when we get paid of course he knows we have money. He sells CDs, tapes and whatever. Red. I approached him about it and he told me he knew somebody. He gave me a number, a Nextel number, and I told him I'd pass it along.

*Id.* Garner added on cross-examination that "Red" was "a jack of all trades," *id.* at 807, and also sold belts and "things like that," *id.* at 805. Garner did not know of any other names "Red" used and could not remember if "Red" ever gave him a business card. Garner had never set up a drug deal with Red before and did not have his phone number.

19

Garner agreed with the Government that on April 13, 2002, the day of the shooting, at around 9 p.m., he met Keith at a McDonald's parking lot in Long Island. Garner was driving a blue car, the same car that was later photographed and searched by the police. Garner knew where to meet Keith because of their walkie-talkie communications and he confirmed that he possessed his cell phone the whole evening and had not given it to anyone else to use. Garner claimed that Keith asked Garner if he would accompany Keith to the drug buy, which was to take place "somewhere around Freeport." Trial Tr. 793. Garner was equivocal, whereupon Keith proposed that Keith and his cousin Merkelson would meet the drug dealer, test the drugs, and that "[i]f everything's fine, then I want to call you and you bring the money and we'll do everything then." *Id.* Garner agreed. Keith put the money for the drugs in Garner's glove box. Included in the stack of money in the glove box, Garner claimed, was about $900 that Keith had given him to pay off about $800 that Keith owed Garner.[8]

Garner estimated that he was in the McDonald's parking lot for only 10 or 15 minutes, and then went directly home, where he parked his car on the street,

---

[8] Garner had earlier testified that the day before the drug deal, he loaned Keith "a couple [of] dollars for the weekend," Trial Tr. 787, but he did not discuss the transaction at any length.

20

with the untouched money remaining in the glove box overnight. He estimated that the drive home took about 15 minutes, and he was home by 9:45 or 10 p.m. Garner was adamant that he did not leave his house after 9:45 p.m. that night. His wife and kids were not home (they were at a child's birthday party), so Garner merely waited for them, changed clothes and relaxed "probably playing video games or watching TV or whatever . . . ." *Id.* at 794. Then, at about 10:30 or 10:45 p.m., Garner's wife came home, and he played and talked with her and the kids.[9] Garner told his wife that he might go out to see Keith, but he was "not sure" if he would and said "let me check." *Id.*

On cross-examination, the prosecution introduced—after Garner's counsel reviewed them and raised no objection—Garner's cell phone records for the night of the shooting. They showed that Garner made no phone calls between 10:06 and 10:28 p.m., but suddenly made a flurry of phone calls starting at 10:28 p.m. The records also showed that two of Garner's phone calls that evening—at 10:28 p.m. and 10:31 p.m., respectively—were to his own home. Both before and after seeing the phone records, Garner separately testified on direct, cross, and redirect examination that he came home between 9:45 and 10 p.m. and never left his house.

---

[9] Neither Garner's wife nor his children testified at trial.

Garner claimed that after his wife came home, Garner called Keith using the walkie-talkie function on his phone but got no response. He later tried again. A voice that Garner did not recognize answered the phone, and so his understanding was that "it wasn't [Keith] answering." *Id.* at 795. The voice said "Who's this?" *Id.* Garner responded "Who's this?" *Id.* Garner testified that he "didn't say anything else," and, after that conversation, he "d[id]n't try to call back." *Id.* Garner testified that he never met Keith in a second parking lot, never drove to North Amityville, and did not shoot Keith.

The next day, Garner drove the blue car to work. He left the money as it was, "locked in the glove box." *Id.* at 797. He was arrested later that day at work. Garner acknowledged that he had a Toyota Camry key on his person when he was arrested, that his wife had a burgundy Toyota Camry, and that he had "access to many cars at [the] dealership," Trial Tr. 826. On cross-examination, Garner was shown a "final notice[]" for a credit card bill for $4,114.97, dated just seven days prior to the robbery, with Garner's name on it. *Id.* at 827–28. Garner said that it was for jewelry he had purchased in 2001.

Garner also admitted on cross-examination that he was convicted of (1) a felony in 1997, and (2) criminal impersonation in 1995 for lying to the police when

22

he pretended to be his cousin, Shawn Garner.   On redirect, Garner disclosed that the felony conviction was for possessing a blackjack, "a piece of leather, wrapped leather, about six inches long with a strap."   *Id.* at 830.

## C. Verdict and Sentencing

On October 24, 2002, after deliberating for about two or three hours, the jury returned a verdict of guilty on all five counts.   The state court judge who presided over Garner's trial thereafter sentenced him to the statutory maximum of 25 years' imprisonment, followed by five years of post-release supervision.   In imposing the maximum sentence, the state court remarked:

> The testimony at your trial was overwhelming.   You shot Mr. Keith with the intent to kill him and you were motivated by greed; namely, a sum of money less than $10,000.
>
> Incredibly, you were on parole at the time of this shooting.
> . . . .
> Your crimes here were deliberate, planned and callous.   The maximum sentence is the only appropriate sentence.

Nov. 21, 2002 Sentencing Tr. at 18.[10]

---

[10] For reasons not pertinent here, Garner was resentenced on October 12, 2006, again to the maximum sentence.

23

## II.  Post-Trial Proceedings

### A. State Court Direct Appeal and Petition for a Writ of Error *Coram Nobis*

On August 26, 2005, Garner—represented by new appellate counsel, the Legal Aid Society—appealed his conviction to the Appellate Division, Second Department.   Garner mounted five arguments in his briefing, including a challenge to the sufficiency of the evidence, but did not raise the issue of whether his trial counsel was ineffective.   The Appellate Division, Second Department unanimously affirmed Garner's conviction.   *See People v. Garner*, 815 N.Y.S.2d 614 (2d Dep't 2006).   On July 7, 2006, the New York Court of Appeals denied Garner's application for leave to appeal.   *See People v. Garner*, 7 N.Y.3d 789 (2006).

Garner then petitioned the Appellate Division, Second Department for a writ of error *coram nobis*, claiming that he was denied the effective assistance of *appellate* (but not trial) counsel.   *See People v. Garner*, 892 N.Y.S.2d 908 (2d Dep't 2010).   On February 9, 2010, the Appellate Division, Second Department denied Garner's petition, determining that he failed to establish ineffective assistance of appellate counsel.   *See id.*

**B. State Court Collateral Attack**

On April 21, 2010, Garner—represented again by new appellate counsel, who remains his current counsel—moved to vacate his conviction under New York Criminal Procedure Law § 440.10(1)(h) (the "440.10 motion").[11] In his 440.10 motion, Garner contended that he was denied the right to meaningful representation by trial counsel and to effective assistance of trial counsel under both the New York State Constitution and the Sixth Amendment to the United States Constitution.

Garner offered seven independent reasons for why trial counsel's performance was constitutionally ineffective: (1) trial counsel conceded improperly in his jury addresses that Keith did not believe that he was lying; (2) trial counsel unreasonably abandoned a hearsay objection; (3) trial counsel failed to make or renew a motion to inspect and dismiss the indictment, which relied impermissibly on hearsay statements; (4) trial counsel made a prejudicial factual misstatement during his opening statement; (5) trial counsel failed to impeach two

---

[11] New York Criminal Procedure Law § 440.10(1)(h) provides that

[a]t any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that . . . [t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States . . . .

prosecution witnesses with prior inconsistent statements; (6) trial counsel failed to object to certain testimony concerning Keith's gunshot wound; and (7) trial counsel failed to obtain Garner's cell phone records before trial, did not object to the records' admission at trial, and also failed to use the records affirmatively to support Garner's case.

On October 4, 2010, the County Court of the State of New York for the County of Suffolk (Efman, *J.*) (the "County Court") denied Garner's 440.10 motion without a hearing. Citing to New York Criminal Procedure Law § 440.10(2)(c) and *People v. Cooks*, 67 N.Y.2d 100 (1986), the County Court began by noting that a 440.10 motion cannot be used to "collaterally challenge an issue which could have been addressed on direct appeal" and that Garner's ineffective of counsel arguments were, "for the most part, issues that could be resolved by examining the record and, therefore, should have been determined on direct appeal."[12] App.

---

[12] New York Criminal Procedure Law § 440.10(2)(c) stipulates that

the court must deny a motion to vacate a judgment when . . . [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, [on direct review], adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him . . . .

261–62. Regardless, the County Court proceeded to analyze each of Garner's claims on the merits and concluded that "a review of the record shows that defendant received effective representation" and "objectively meaningful representation" under both federal and state law. *Id.*; *id.* at 267. As a result, the County Court did not assess whether Garner's trial counsel's alleged errors were in fact prejudicial. Two-and-a-half months later, on December 23, 2010, the Appellate Division, Second Department denied Garner's application for leave to appeal the County Court's denial of Garner's 440.10 motion.

## C. Federal Habeas Petition

On January 3, 2011, Garner filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York (Feuerstein, *J.*) under 28 U.S.C. § 2254, (1) raising, as in his 440.10 motion, the same seven independent reasons for why trial counsel's performance was constitutionally ineffective, and (2) alleging that his constitutional due process and fair trial rights were violated when the trial court denied his mid-trial mistrial motion following

_____

In *Cooks*, the New York Court of Appeals explained that the purpose of this provision "is to prevent [N.Y. Crim. Proc. Law §] 440.10 from being employed as a substitute for direct appeal when defendant was in a position to raise an issue on appeal or could readily have raised it on appeal but failed to do so." *Cooks*, 67 N.Y.2d at 103 (internal citations omitted).

27

the trial court's colloquy with certain jurors about their potential exposure to an article in *Newsday* discussing the trial.[13]

Over two years after Garner's petition was filed, on April 25, 2013, the case was transferred to a different district court judge (Chen, *J.*) (the "district court"). The district court held an evidentiary hearing on Garner's petition on February 24, 2016, and also heard oral argument on December 7, 2015 and February 24, 2016. On December 13, 2016, the district court determined that Garner's petition was not procedurally barred and granted Garner's petition on the merits. *See Garner v. Lee*, No. 2:11-cv-00007 (PKC), 2016 WL 7223335 (E.D.N.Y. Dec. 13, 2016).

The district court did not examine Garner's due process and fair trial argument nor address six of his seven bases for supposed ineffective assistance of counsel. Instead, the district court concluded that trial counsel's conduct with respect to the phone records constituted prejudicially deficient performance and granted the habeas petition on this sole ground. In particular, the district court

_____

[13] Garner's second argument—about the *Newsday* article—had been presented on direct appeal to, and unanimously rejected by, the Appellate Division, Second Department. The mid-trial *Newsday* article mentioned that, five years before Garner's in-progress Suffolk County trial (for Keith's shooting), a Nassau County jury acquitted Garner of two separate murders. The article compared the prior murders and Keith's attempted murder, noting that each victim was shot in the head, the same defense attorney represented Garner in all of the proceedings, and the shootings all arose out of drug debts or robberies.

28

concluded that phone records introduced by the prosecution during Garner's cross examination, which showed calls from his cell phone to his house at 10:28 p.m. and 10:31 p.m.—when he testified that he was home—were "devastating." *Garner*, 2016 WL 7223335, at *8. The district court insisted that the County Court had unreasonably applied *Strickland* in determining that Garner's attorney was not constitutionally deficient for failing to obtain and review the phone records in advance of trial. *Id.* The district court then applied the *Strickland* standard *de novo* and concluded that Garner had sufficiently demonstrated both constitutionally deficient performance and prejudice. *Id.* at *9–14.

Respondent-Appellant William Lee ("Lee") appealed, filed a motion to stay the judgment, and the Suffolk County District Attorney's Office announced its intention to retry Garner if Lee's appeal was unsuccessful. The district court granted the motion to stay. Garner moved for bail pending appeal and, on April 18, 2017, a three-judge panel of this Court denied Garner's motion.

**STANDARD OF REVIEW**

"We review [a] district court's grant of a petition for habeas corpus *de novo*, and its underlying findings of fact for clear error." *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).

29

## DISCUSSION

### I. Lee's Procedural Claims

**A. Procedural Default**

Lee first contends that the district court erred in deciding that Garner did not procedurally default the claim on which the court granted relief. We disagree. "[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). But, for this procedural default rule to apply, the state court must have "*clearly and expressly state[d]* that its judgment rest[ed] on a state procedural bar." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 118 (2d Cir. 2015) (emphasis added) (quoting *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006)). In other words, "it must be 'clear from the face of the opinion' that the state court's decision rest[ed] on a state procedural bar." *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)).

While a state court may rest its judgment on a state procedural bar if it rejects the merits of a federal claim *only in the alternative, see Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996), the Supreme Court has admonished that, when in doubt, courts

should presume that the state court adjudicated the claim on the merits, *see Richter*, 562 U.S. at 99 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)); *see also Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001) (Sotomayor, *J.*) (noting that a state court's reliance on a state procedural bar must be "unambiguous"). When, as here, there is "ambiguity" in a state court opinion that "prevent[s] us from definitively concluding that" the state court relied on a state procedural bar—such as when the "opinion states that a group of contentions is either without merit 'or' procedurally barred"—we will presume that the state court resolved the decision on the merits and that we are not precluded from reviewing the claim's merits. *Messiah*, 435 F.3d at 196 (quoting *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003)).

Such ambiguity is present here. First, the County Court noted that Garner's arguments were, "*for the most part*, issues that could be resolved by examining the record and, therefore, should have been determined on direct appeal," App. 261 (emphasis added); it never specified, however, *which* of Garner's seven arguments it deemed unpreserved for collateral review. The County Court then ambiguously noted that Garner could not use a 440.10 motion to "collaterally challenge *an issue* which could have been addressed on direct appeal," *id.* at 262 (emphasis added), without noting to *which issue* it was referring. After devoting

31

all of two cryptic sentences to the procedural default issue, the County Court spent over 25 paragraphs—spanning five full single-spaced pages—scrutinizing Garner's claims on the merits. Then, at the very end of its opinion, the County Court wrote that it "[a]ccordingly[] . . . finds that defendant was provided with objectively meaningful representation[,]" *id.* at 267, and offered nothing to suggest that its merits finding was merely an alternative holding.

Given all this, we conclude that there is sufficient ambiguity about whether the County Court's judgment was premised solely on a state procedural bar so as to foreclose Lee's argument. Because we apply a presumption against finding a state procedural bar in cases of doubt, *see, e.g.*, *Richter*, 562 U.S. at 99; *Messiah*, 435 F.3d at 196; *Galarza*, 252 F.3d at 637, we agree with the district court that Garner's claim is not procedurally defaulted.

**B. Evidentiary Hearing**

Lee next submits that the district court ran afoul of the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), by holding an evidentiary hearing and considering evidence outside the state court record in determining whether to grant Garner's petition. We disagree.

28 U.S.C. § 2254 allows a court to entertain a habeas petition "only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended this statute and added a further requirement.  Under AEDPA, when a state court has "adjudicated" a petitioner's habeas claim on the merits, a district court may grant relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  In *Pinholster*, the Supreme Court explained that "evidence introduced in federal court has no bearing on § 2254(d)(1) review," and that a federal habeas court, in conducting § 2254(d)(1) review, cannot consider evidence outside the state court record.  *Pinholster*, 563 U.S. at 185; *see also id.* at 182–83 ("Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did. . . . It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").  Crucially, however, in

33

addition to satisfying § 2254(d), a habeas petitioner must *also* demonstrate "by a preponderance of the evidence that his constitutional rights have been violated," *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (quotation omitted)—a legal analysis that the district court conducts *de novo*, *see Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam). *Pinholster* does not bar a federal habeas court from holding an evidentiary hearing and considering evidence beyond the state court record when it engages in this non-§ 2254(d), *de novo* review. *See, e.g.*, *Stechauner v. Smith*, 852 F.3d 708, 722 (7th Cir. 2017); *Madison v. Comm'r, Alabama Dep't of Corr.*, 761 F.3d 1240, 1249 & n.9, 1249–50 (11th Cir. 2014); *Sanchez v. Roden*, 753 F.3d 279, 307 (1st Cir. 2014).

Here, the district court made abundantly clear that it was limiting its § 2254(d)(1) review to the state court record—and that it would not consider any evidence adduced from its evidentiary hearing in its § 2254(d)(1) analysis. It considered evidence introduced for the first time in federal court only during its non-§ 2254(d)(1), *de novo* review of Garner's claim. The question of whether the district court made a *substantive* error in its § 2254(d)(1) or non-§ 2254(d)(1) *de novo* analysis is a separate matter that we discuss below. As a pure matter of *procedure*, however, the district court did not run afoul of *Pinholster* by holding an evidentiary

34

hearing and considering evidence outside the state court record for purposes of its non-§ 2254(d)(1), *de novo* review.

## II. Ineffective Assistance of Counsel

We now turn to the merits of Garner's petition. In *Strickland*, the Supreme Court promulgated a two-prong test to evaluate ineffective assistance of counsel claims: "a defendant must demonstrate both 'that counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'" *Waiters*, 857 F.3d at 477 (quoting *Strickland*, 466 U.S. at 687). The *Strickland* Court also declared, however, that "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . ." *Strickland*, 466 U.S. at 697. As the Supreme Court admonished, "[t]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*; *accord Mitchell v. Scully*, 746 F.2d 951, 954 (2d Cir. 1984) (Friendly, *J.*).

Because the evidence of Garner's guilt presented at trial was truly overwhelming, this is a case in which it is far easier to dispose of an ineffectiveness claim on the second *Strickland* prong alone. We will therefore assume *arguendo* that the district court correctly concluded that the County Court unreasonably applied *Strickland*, and also assume *arguendo*—again, without deciding—that there was no strategic rationale for Garner's trial counsel's conduct with respect to Garner's phone records.[14] Because the County Court did not reach the prejudice

---

[14] Mindful that on remand the district court might again apply AEDPA to address Garner's remaining *Strickland* claims, we do note that the district court erred in relying on language from one of our AEDPA precedents—*Monroe v. Kuhlman*, 433 F.3d 236, 246 (2d Cir. 2006)—in articulating the standard for AEDPA review. Quoting *Monroe*, the district court wrote that although "[s]ome increment of incorrectness beyond error is required [to satisfy AEDPA] . . . *the increment need not be great*; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Garner*, 2016 WL 7223335, at *7 (emphasis in original) (quoting *Monroe*, 433 F.3d at 246). We do not believe, however, that this standard (which we will call the "some increment of incorrectness" standard, and which originated in *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)), survived the Supreme Court's decision in *Richter*, 562 U.S. at 102. *Richter* imposes a more deferential AEDPA standard of review, requiring courts to assess whether the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Although we have cited the "some increment of incorrectness" standard in several cases since *Francis S.*, *see, e.g.*, *Jones v. West*, 555 F.3d 90, 96 (2d Cir. 2009); *Hemstreet v. Greiner*, 491 F.3d 84, 89 (2d Cir. 2007); *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005), our more recent AEDPA decisions have instead (correctly) cited *Richter*'s more deferential "no reasonable jurist" standard, without mentioning *Francis S.* and its progeny, *see, e.g.*, *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017); *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017); *Fuentes v. T. Griffin*, 829 F.3d 233, 245 (2d Cir. 2016); *Rivas v. Fischer*, 780 F.3d 529, 546 (2d Cir. 2015).

issue, we examine *de novo* whether Garner's defense was constitutionally prejudiced by trial counsel's conduct. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005). For the reasons set forth below, we conclude that the district court erred in determining that Garner satisfied *Strickland*'s prejudice prong, and we therefore vacate the district court's grant of habeas relief.

## A. The *Strickland* Prejudice Prong

To establish *Strickland* prejudice, Garner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. That is, Garner must show that he was "deprive[d] . . . of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Richter*, 562 U.S. at 111 ("*Strickland* asks whether it is 'reasonably likely' the result would have been different." (quoting *Strickland*, 466 U.S. at 696)). [15] "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome

---

[15] The Supreme Court has noted that "the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Richter*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 697).

or whether it is *possible* a reasonable doubt might have been established if counsel acted differently"; instead, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111–12 (emphasis added); *see also Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (internal citation omitted)).

The prejudice analysis should also "be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" *Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (quoting *Strickland*, 466 U.S. at 695). The prejudice inquiry is therefore ineluctably tied to the strength of the prosecution's evidence. "[A] verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'" *Waiters*, 857 F.3d at 480 (quoting *Strickland*, 466 U.S. at 696). As a result, "[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001).

### B. Juror Statements

Before applying the *Strickland* standard to the facts of Garner's case, we note that to the extent the district court relied on a juror's post-trial statements to evaluate *Strickland* prejudice, *see, e.g., Garner*, 2016 WL 7223335, at *11 ("[T]he devastating impact of the prosecution's use of the cellphone records to cross-examined [*sic*] Petitioner is borne out by . . . one juror's statements to the media and a private investigator after the trial . . . ."), the district court committed error. As the Supreme Court explained in *Strickland*, "evidence about the actual process of decision . . . should not be considered in the prejudice determination," because the proper focus of the inquiry is the reliability of the result, from an objective viewpoint, and not the "unusual propensities" of particular judges or jurors. *Strickland*, 466 U.S. at 695; *accord Hill*, 474 U.S. at 60; *see also Miller v. Angliker*, 848 F.2d 1312, 1323 (2d Cir. 1988) (describing, as "clear directions," the Supreme Court's instructions in *Hill* and *Strickland* that courts must evaluate prejudice claims from the perspective of an objective factfinder); *cf. Peterson v. Douma*, 751 F.3d 524, 532 (7th Cir. 2014) ("[T]he *Strickland* prejudice inquiry is an objective one and cannot rest solely on the trial judge's say-so."  (citation and internal quotation marks omitted)); *Saranchak v. Beard*, 616 F.3d 292, 309 (3d Cir. 2010)

(explaining that it was error for a court to "consider[] the effect the new evidence would have had on th[e] particular judge . . . rather than considering, more abstractly, the effect the same evidence would have had on an unspecified, objective factfinder, as required by *Strickland*").  We need not dwell here on the many reasons why *Strickland*'s prejudice inquiry does not and should not turn on the selective, unsworn, after-the-fact comments of trial jurors.[16]  We simply reaffirm that, given "the clear directions in *Hill* and *Strickland*[,] . . . the likely outcome of a trial should be assessed objectively, without regard for the idiosyncrasies of the particular decisionmaker."  *Miller*, 848 F.2d at 1323 (internal quotation marks omitted) (quoting *Hill*, 474 U.S. at 60–61).

---

[16] Full explication of this topic is unnecessary because, among other reasons, the rationale for discouraging post-verdict contact with jurors has been recited in the case law on many occasions. *See, e.g.*, *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017) (stressing the importance of limiting counsel's post-trial contact with jurors "to provide jurors some protection when they return to their daily affairs after the verdict has been entered"); *id.* at 865 (emphasizing that restrictions on post-verdict scrutiny of jurors have "substantial merit" because they "give[] stability and finality to verdicts" and "promote[] full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict"); *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) ("[P]ost-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.").

### C.  Application of the *Strickland* **Prejudice Prong**

#### 1.  De Novo *Review*

After reviewing the record *de novo*, we see no reason to disagree with the state trial court's assessment that the evidence against Garner was "overwhelming," Nov. 21, 2002 Sentencing Tr. at 18; Oct. 12, 2006 Resentencing Tr. at 18.   Keith's eyewitness account of the night in question was first given at the scene of the crime to Officer Gover. At that time, Keith fully expected to die from the gunshot wounds he had sustained. Officer Gover established that Keith's trial testimony was wholly consistent with that first account in all its key features: (1) that Garner had shot him; (2) that Keith had come to North Amityville with Garner to buy drugs; (3) that he met Garner through a third individual named Waring about two years ago; (4) that Garner lived in south Freeport, sold cars at a Five Towns dealership, was approximately six feet three inches tall and 210 to 220 pounds, was wearing dark clothing, and had a series of tattoos on his hand, neck, and leg, which Keith described in detail; (5) that, as to the shooting, Keith "had stepped out of the passenger side, the front seat of the passenger side of the vehicle, and walked approximately ten to fifteen feet from that door[,]" when he "heard a loud sound, felt a pain in the back of his neck and head area, and then he

41

hit the floor, and he said he realized he had been shot[,]" *id.* at 312; and (6) that,

after Officer Gover had been at the scene for some time, Keith's phone rang and

Officer Gover picked up, having an incriminating conversation with Garner.    On

cross-examination, Officer Gover was adamant that Keith was "very alert, very

attentive," *id.* at 326, and "very coherent," *id.* at 327.[17]

Keith's account was substantially corroborated by the testimony of several

other witnesses—including Merkelson, Detective Walsh, and Detective

Faughnan—and critical physical evidence.    Merkelson corroborated Keith's

testimony: (1) that Garner never revealed the identity or address of the supposed

"drug seller" in North Amityville; (2) that Merkelson distinctively rubber-banded

the drug money using beige, red, and blue rubber bands; (3) that Merkelson gave

Keith $9,700 of rubber-banded money; (4) that Garner was wearing eyeglasses the

night in question; (5) that the original plan was for Merkelson, Garner, and Keith

---

[17] Detective Walsh, who the trial court found "to be a credible and straightforward witness," *id.* at 269, similarly testified that Keith was forthcoming and told him in the ambulance, among other information: his name; that Garner shot him for drug money; that he had known Garner for almost two years; that Garner lived in south Freeport; and that Garner had driven him to the site of the shooting in Garner's car.    Detective Walsh said that at no time did he have "any hesitation" about arresting Garner in connection with Keith's shooting.    *Id.* at 550.

42

to all go together to buy drugs but Garner unexpectedly changed the plan the night in question; and (6) that Garner told Keith to meet him at a second parking lot.

Moreover, as to the second parking lot, Merkelson's testimony was completely consistent with Keith's testimony but wholly at odds with Garner's account. While candidly admitting that he did not see Garner in the second parking lot, but only a solo driver in the car in which Keith rode away, Merkelson testified that the unmistakable plan was that Keith and Garner would buy the drugs together and then they would return to the parking lot. Merkelson was "definite[ ]" that Keith rode away with Garner, Trial Tr. at 369, because even though Merkelson did not converse with Garner in the second lot, "it was clear . . . that [Keith] was going with [Garner][,]" *id.* at 397; "there was never any discussion" that Keith would buy the drugs with someone besides Garner, *id.* at 398; he did not "see any other way to interpret" the events in question, *id.* at 397; and Keith and Garner had been in "pretty much constant contact" with the Nextel's walkie-talkie function before Garner arrived at the second parking lot, *id.* at 398. There was thus "no question in [Merkelson's] mind" that Garner was supposed to and did accompany Keith to the ill-fated drug buy, *id.* at 398.

43

Detectives Walsh and Detective Faughnan provided still further corroboration of Keith's version of the events. At the precinct, Detective Walsh asked Garner basic pedigree questions, and observed that Garner wore eyeglasses and had several tattoos, which corroborated Keith's description. And after executing a search warrant on Garner's blue-green car, Detectives Walsh and Faughnan recovered from the glove box (and photographed) a large sum of money wrapped in red, blue, and beige rubber bands. Furthermore, when Garner was arrested, the detectives recovered on his person additional physical evidence probative of a motive for robbery: a black leather folding portfolio replete with personal papers revealing, as Detective Faughnan testified, "[a] lot of creditors looking for monies" or "[c]ollection type notices." *Id.* at 705.

In stark contrast to the prosecution's case-in-chief, Garner presented a thin and wholly uncorroborated narrative during his defense case, which was riddled with damaging holes. Garner denied that he ever met Keith in a second parking lot, drove to North Amityville, or shot Keith. Garner instead testified, repeatedly and under oath: (1) that Keith gave him the money for the drug deal to hold, awaiting Keith's call; (2) that he was home by 9:45 or 10 p.m.; and (3) that he did not leave his house once he got home. At the habeas hearing before the district

44

court, Garner's trial counsel, *who spoke with him the day after the crime*, testified that: (1) Garner's trial testimony "was in material aspects the same as the information [Garner] had given [him]," App. 134; (2) at trial, he "heard nothing [from Garner] that was materially different from what [Garner] had told [him]," *id.* at 135; (3) Garner's trial testimony "was in conformity with [their] prior discussions," *id.* at 137; and (4) he and Garner "had a very good relationship" and "spoke about the facts," *id.* at 165.

Garner bears the burden of showing prejudice, *Waiters*, 857 F.3d at 479, and so it is noteworthy that he has to this day never identified a single witness who can corroborate any aspect of his tale. Nor has he proved able to identify anything approximating a plausible motive for why Keith would falsely and steadfastly maintain that Garner shot him, nor why Merkelson would assist in propagating this narrative, if untrue.[18] *See* Br. for Pet'r-Appellee at 39 ("It remains

---

[18] At oral argument before the district court on February 24, 2016, Garner's current counsel struggled with this problem, urging, for instance, that Keith was obviously capable of deception because, after being shot, he pretended to be dead when the shooter re-approached him:

> Now I know, Your Honor, I think we all wonder in such a case why somebody would make something up. We know that . . . Mr. Keith was capable of making things up even when he first told the cop, the officer, Officer Gover that it was [Garner] who did it, because we know it a couple of ways. One, he said he had been playing dead so he's conscious enough to—thinking enough to pretend to be dead. . . . So Keith was certainly

45

an unsolved mystery why Keith would falsely accuse Garner.").   On this front, at the habeas hearing before the district court, Garner's trial counsel testified that he and Garner "had a very good relationship[,]" they "spoke about the facts" and about "what [they] felt would be the best defense."   App. 165.   "And based on everything else that was there," Garner's trial counsel revealingly conceded, they jointly determined that claiming that Keith had experienced a vision that Garner had shot him "would be a better defense rather than arguing that somebody that attended your wedding that was a friend of yours would have a motive to all of a sudden lie and so forth."   *Id.* at 166.

In sum, Garner's conviction was "supported by overwhelming evidence of guilt."   *Lindstadt*, 239 F.3d at 204.   Garner therefore bears a heavy burden, to say the least, in demonstrating that his attorney's allegedly "serious errors" at trial merit the grant of habeas relief.   *See id.*   As explained below, Garner has failed to carry this burden.

---

capable of fabricating and capable of concealing at that point in time.   Why would he do it, Judge, I can only speculate.

App. 206.

## 2. *The Phone Records*

The district court concluded that had Garner's trial counsel obtained Garner's phone records before trial, there is a reasonable probability that the outcome of Garner's trial would have been different. The district court determined that Garner's counsel could have used the phone records for two different purposes. First, Garner's counsel could have used the phone records *defensively* by reviewing those records with Garner before trial. The district court insisted that doing so might have led Garner to change his testimony on the stand, or not to testify at all. Second, the district court concluded, Garner's counsel could have used the phone records *offensively*. Specifically, the district court insisted, Garner's counsel could have: (1) argued to the jury that, based on the 911 calls that took place after Keith was shot, the shooting occurred not on or before 10:25 p.m., as the prosecution contended, but rather between 10:31 p.m. and 10:41 p.m.; then (2) pointed out to the jury that, according to the phone records, Garner was on his phone continuously between 10:31 p.m. to 10:41 p.m.; and thus, finally, (3) argued to the jury that it is highly unlikely that Garner "was shooting Keith while simultaneously making a phone call, or in the midst of making a series of phone calls." *Garner*, 2016 WL 7223335, at *13. We do not believe, however, that

47

it is "substantial[ly]" likely that Garner's trial would have resulted in a different verdict even if Garner's counsel had reviewed the records with his client before trial and used them in the manner that the district court described. *See Richter*, 562 U.S. at 112.

a. Defensive Use of the Phone Records

With regards to the possible "defensive" use of the phone records, the district court posited that had Garner's counsel reviewed the phone records with Garner before trial, one of two possibilities was likely. One possibility is that Garner might have "remember[ed] more precisely his whereabouts at different times that night and where he might have been" at 10:28 p.m. and 10:31 p.m., and thus would have presented a revised narrative on the stand to avoid incorrectly stating that he was home at the time. *Garner*, 2016 WL 7223335, at \*12 n. 25. The other possibility, the district court insisted, is that Garner might not have testified at all, "leaving the jury to decide the case based almost exclusively on Keith's and Merkelson's testimony." *Id.* at \*12. Neither possibility, we conclude, would have produced a substantial likelihood of a different verdict.

First, if upon review of the records, Garner did not take the stand, there is no reasonable likelihood that he would not have been convicted given the strength

48

of the prosecution evidence detailed earlier in this opinion. *See Richter*, 562 U.S. at 111.

Second, *even if* Garner had decided to take the stand after reviewing the phone records, it is far from clear that Garner would have revised his testimony. To be sure, seven-and-a-half years after trial, Garner insisted in a 2010 affidavit that

> [i]f [he] had reviewed the phone records before testifying, it would have come back to [him] that when [he] came home and found [his] wife and children still out [he] went out again, called home at 10:28 and 10:31 p.m., tried to call Mr. Keith later, and then came home and tried to call Mr. Keith again.

Affirmation in Answer, *Garner v. Lee*, No. 2:11-cv-00007-PKC (E.D.N.Y. Mar. 10, 2011), ECF No. 9-2 at 38 ("2010 Affidavit"). But Garner uniformly and persistently testified on direct, cross, and redirect examination at trial, under oath and *both before and after seeing the phone records*, that he came home between 9:45 p.m. and 10 p.m. the night of the shooting and never left his house thereafter. Garner's trial counsel further testified at the habeas proceeding that Garner's trial testimony "was in material aspects the same as the information [Garner] had given [him]," App. at 134, and that Garner's trial testimony "was in conformity with [their] prior discussions," App. at 137. Furthermore, Garner was arrested the day

49

after the events in question and Garner's trial counsel was in communication with him within hours of the arrest.[19] In other words, Garner's testimony at trial *was his story from the beginning, and in the immediate aftermath of the events.* Given that "[s]olemn declarations in open court carry a strong presumption of verity," and that "[t]he subsequent presentation of conclusory allegations unsupported by specifics is" often "subject to summary dismissal," *Blackledge v. Allison*, 431 U.S. 63, 74 (1977), we are far from convinced that, *even if* Garner had reviewed the phone records before trial and decided to testify regardless, his testimony would have changed.

But even assuming *arguendo* that, after reviewing the phone records, Garner would have taken the stand and revised his narrative in accordance with his 2010 Affidavit,[20] even his *updated* narrative is irreconcilable with the trial evidence for (at least) three reasons. First, Garner's revised narrative remains impeached by Officer Gover's testimony at trial. According to Garner's 2010 Affidavit, Garner arrived home after meeting with Keith, noticed that his wife and kids were out,

---

[19] Garner had a preexisting relationship with his counsel, who had previously represented him successfully at a 1997 double murder trial.

[20] We will also assume, *arguendo*, that nothing in this hypothetical review of the phone records before trial would have led Garner to give false testimony, because "[w]hatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely*." *Nix v. Whiteside*, 475 U.S. 157, 173 (1986).

left his house, called home at 10:28 and 10:31 p.m., called Keith from outside his home, "and then came home and tried to call . . . Keith again."  2010 Affidavit at 38.  Garner also made clear during trial that it was during his final call to Keith that evening that an unknown individual (*i.e.*, Officer Gover) answered the phone. *See* Trial Tr. 795 (noting that after speaking with Officer Gover, Garner hung up and "d[id]n't try to call back").  Thus, according to Garner's revised narrative, he was *at home* when he placed this final call to Keith the night of the shooting.  That claim, however, remains contradicted by Officer Gover's sworn testimony on both direct and cross-examination that when he answered Garner's call to Keith at the crime scene and spoke to Garner, Garner told Officer Gover that he was "*on the parkway*."  Trial Tr. 317 (emphasis added), 331 (emphasis added).  This testimony was strongly corroborated by Officer Gover's ensuing action: he testified that he then told a police dispatcher to alert officers within the county and in adjacent counties that Garner, an attempted murder suspect, was *on the parkway*. Detective Faughnan independently corroborated that Officer Gover put out such a notification.  Garner has yet to provide any sort of explanation—either in his 2010 Affidavit or at his habeas evidentiary hearing—for the glaring contradiction between his insistence that he made his final call to Keith from his home, and

51

Officer Gover's sworn trial testimony, corroborated by his own dispatch, that Garner said during this call that he was on the parkway.

Second, nothing in Garner's revised narrative accounts for a crippling discrepancy between (1) Garner's insistence that he merely served as a custodian for the drug deal funds—and guarded the funds for "safekeeping" while Keith tested the drugs, 2010 Affidavit at 26—and (2) the fact that when Garner was arrested, the police recovered only $7,440 of the $9,700 drug money. Merkelson repeatedly testified that he gave Keith $9,700 of rubber-banded money. He testified that he "vividly" remembered rubber-banding the funds. *Id.* at 357. Keith put the money in Garner's car's glove box and echoed Merkelson's testimony about the amounts, confirming that there was $8,000 for ecstasy for Merkelson, and $1,700 for cocaine for himself. When asked about this amount on cross-examination, Keith stressed that there was no uncertainty about the $9,700 figure. In fact, Keith testified that if he was told that only $6,300 was in the glove box (as opposed to $9,700), that "would make [him] think that somebody removed some of the money." *Id.* at 525. Yet, when Garner was arrested 18 to 19 hours after Keith's shooting, only $6,300 of rubber-banded funds were recovered from the glove box with an additional $1,140 found on his person.

52

Garner could not—and still cannot—account for the missing $2,260. He claimed at trial, without any record support and in opposition to Keith's and Merkelson's testimony, that included in the stack of money was about $900 that Keith had given Garner to pay off an $800 debt. Garner has not "updated" this figure in his 2010 Affidavit. Yet even crediting Garner's unsupported assertion that $800 or $900 of the $9,700 was for him to keep, he *still* cannot explain the remaining missing $1,360 or $1,460. Thus, to subscribe to Garner's revised narrative, jurors would have had to believe that Garner's sole task was to guard the funds for safekeeping even though he cannot explain—even 16 years later— how within roughly 20 hours of receiving the funds, between $1,360 and $2,260 went missing. The prosecution seized on this unexplained discrepancy, making the missing funds the very first argument of its summation:

> [W]hy is it $1,140 in this hand and $6,300 in this hand? Why doesn't that add up to what the evidence shows was ninety-seven hundred dollars that was brought to North Amityville that night? Because I submit to you, ladies and gentlemen, that within the eighteen hours before this defendant was arrested he started spending this money.

*Id.* at 871–72.[21] Simply put, Garner's revised narrative cannot surmount his acute problem with the physical evidence: the funds do not add up.

---

[21] Dealt this difficult hand, Garner's counsel tried his best (1) to get Keith to depart from the $9,700 figure during cross-examination (he failed); and, alternatively, (2) to

Finally, nothing in Garner's revised narrative provides any additional information about the supposed alternative perpetrator: the mysterious and elusive "Red," about whom the prosecution hammered Garner during cross-examination and in summation. Among other trial testimony, Garner admitted that he knew of no other names that "Red" used, had never set up a drug deal with Red before, and did not have his phone number stored. On cross-examination, Garner agreed with the prosecution's summary of his testimony: he "put Dread in touch with Red," it was "Dread meet Red to make a drug deal." *Id.* at 807. Unsurprisingly, the prosecution devoted considerable portions of its summation to attacking Garner's testimony about "Red":

> [I]f you were charged with attempted murder in the second degree and arrested within eighteen hours of the incident, just eighteen hours later, . . . . wouldn't you [] make it your business to know who Red was? Wouldn't you try to find that business card that had his name on it, and telephone number, to find out who this Red was who supposedly did this killing or attempted killing? Wouldn't you try to find that out?
>
> I submit to you, ladies and gentlemen, that didn't happen because Red doesn't exist. There is no Red, ladies and gentlemen.

---

downplay its significance by conceding that while the "exact amount" of the funds was "questionable," ultimately "[w]hether it's ninety-seven, ninety-six, ninety-eight hundred, *doesn't matter . . . . it's not so much the dollar amount*." Trial Tr. 289–90 (emphasis added).

*Id.* at 872–73.   Even though Garner claimed that "Red" came to the car dealership on weekends, he has never—including at trial in 2002, in his 2010 Affidavit, or at the 2016 habeas hearing before the district court where he declined to testify—put forward a single witness (such as a co-worker) to testify that "Red" even exists.

In sum, Garner's revised narrative presents no likelihood, much less a substantial one, of a different result.   Indeed, we cannot even say with confidence what Garner might have testified to, if he had taken the stand to present this story. *Cf., e.g.*, *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) ("Since [the potentially exculpatory witness] offered different versions of the salient events at different times, no one . . . can say with any confidence what her testimony would have been [had she testified].").   Garner's revised narrative is sufficiently full of holes that, as the district court concluded, if Garner had reviewed his cell phone records before trial, "it is more likely that [Garner] would not have pursued an alibi defense and would not have testified."   *Garner*, 2016 WL 7223335, at *12.   Given Keith's and Merkelson's testimony, the district court also concluded that, "[w]ere this the only likely scenario," there would not be a "reasonable probability that the outcome of the trial would have been different."   *Id.* (internal quotation marks omitted).   We agree. We therefore next turn to the district court's insistence that

Garner's counsel could have also used the phone records *affirmatively* to create reasonable doubt about Garner's guilt.

### b. Affirmative Use of the Phone Records

The prosecution's theory at trial was that Garner drove Keith to North Amityville between 10:00 p.m. and 10:25 p.m., shot Keith at approximately 10:25 p.m., and then made a flurry of phone calls starting at 10:28 p.m. And, as noted above, Garner's phone records indeed establish that his phone was in use continuously between 10:28 p.m. and 10:41 p.m. The prosecution also played a 911 call for the jury that the prosecution claimed took place at "approximately 10:40 p.m." Trial Tr. 883; *see also id.* at 886 (referencing "[t]he good Samaritan on the street who called 911 at 10:40"). The prosecution thus told the jury that Garner's phone records corroborated its proposed time frame, and expressly urged the jury to "[t]ake [the phone] records" into the jury room and examine them for themselves. *Id.* at 875.

The district court concluded that, had Garner's trial counsel obtained Garner's phone records before trial, he could have argued to the jury that Keith was shot not at 10:25 p.m., as the prosecution insisted, but rather "between 10:31 p.m. and 10:41 p.m.," a period during which Garner's phone was in use. *Garner*,

2016 WL 7223335, at *13. Specifically, the district court insisted that Garner's counsel could have made the following argument to the jury: (1) *two* 911 calls were made following Keith's shooting, with one having occurred before the other; (2) the first 911 call, which the prosecution played for the jury, occurred at approximately 10:41 p.m.;[22] (3) the second 911 call—which the prosecution did *not* play for the jury—must have therefore occurred no earlier than approximately 10:41 p.m.; (4) on the second 911 recording, the caller insisted that the shooting had occurred "five to ten" minutes prior to the call; thus, (5) given that the second 911 call occurred no earlier than approximately 10:41 p.m., even if the shooting had happened a full ten minutes prior, "the shooting could not have occurred any earlier than 10:31 p.m.," when Garner was apparently on the phone. *Garner*, 2016 WL 7223325 at *13 n. 27. The district court thus concluded that, by obtaining Garner's phone records in advance and making such an argument, Garner's counsel could have created reasonable doubt of Garner's guilt.

―――――――――――

[22] The district court insisted that "[a]lthough the exact times of the 911 calls are not in the record," it could discern the "approximate" time of the first 911 call based on the evidence submitted at trial. *Garner*, 2016 WL 7223325 at *13 n. 27. Given that the prosecution itself argued to the jury that the first 911 call occurred at "approximately" 10:40 p.m., Trial Tr. 883, we do not believe that the district court's factual finding is clearly erroneous. *See Waiters*, 857 F.3d at 477.

We are not persuaded. First, the district court's argument hinges not on the phone records *per se*, but rather on the content of the second 911 call, which the prosecution did not play for the jury.[23] The prosecution did not dispute at trial that Garner's phone records established that Garner was on the phone constantly between 10:28 p.m. and 10:41 p.m. Nor is this surprising, given that the timing of these calls was potentially helpful to Garner *only if* the crime took place within that period and not at about 10:25 p.m., as the prosecution asserted. The district court concluded, in granting habeas relief, that the second 911 call undercut the prosecution's theory that the shooting occurred at approximately 10:25 p.m. *See, e.g., Garner,* 2016 WL 72223335, at *13 n.30 ("It is clear from the record that Petitioner's counsel never analyzed the 911 calls to determine the likely time frame for the shooting."). But we perceive no substantial probability that the result here would have been different, even assuming that Garner's counsel had used the second 911 call just as the district court contends it should have been employed.

Simply put, and contrary to Garner's contention on appeal, the second 911 call certainly does *not* conclusively "establish[] that the shooting occurred between

---

[23] To be clear, neither party placed either records of the 911 calls or transcripts of their contents into the record on appeal. We therefore assume, *arguendo,* that the district court opinion accurately reflects the contents of the second 911 recording.

10:31 p.m. and 10:41 p.m.," Br. for Pet'r-Appellee at 9, rather than 10:25 p.m., as the prosecution contended.[24] Garner's argument hinges entirely on the 911 caller's off-the-cuff estimate that the shooting occurred about "five to ten" minutes prior to her call, which the district court itself estimated as occurring at "approximate[ly]" 10:41 p.m. *Garner*, 2016 WL 7223325 at *13 n. 27. Even a skilled trial attorney would have had difficulty using these rough approximations of time to create a reasonable doubt in the mind of a juror, especially because the argument collapses completely if the approximations are off by as little as a few minutes. Against the evidence of the second 911 call, we must weigh the fact that, among other things: (1) Keith stated repeatedly—both to the officers at the scene shortly after the shooting and under oath at trial—that Garner shot him; (2) Merkelson corroborated Keith's testimony that the plan was for Garner to meet

---

[24] Inexplicably, Lee seemed to concede at oral argument before our Court that the 911 evidence establishes that the shooting occurred between 10:31 p.m. and 10:41 p.m. But counsel's statement to this effect cannot be taken at face value. Lee also insisted— confusingly—that he was basing his assessment solely on the evidence presented at trial, even though the second 911 call—which the district court found critical for establishing the relevant time frame—was never played for the jury. Lee also erroneously stated that "the prosecution argued that the shooting occurred sometime after . . . 10:28" p.m., Oral Arg. at 50:47–57, even though the prosecution actually argued to the jury that the shooting occurred no later than 10:25 p.m., *see* Trial Tr. 874, 876. Suffice it to say that we have found the record to be a surer guide to the trial evidence than these representations at oral argument.

Keith in the second parking lot and drive him to North Amityville; (3) Garner was found the day after the shooting with Merkelson's distinctively wrapped drug money bundle in his possession, and with more than $2,200 missing from that bundle; (4) Garner had a clear motive to rob Keith that evening, and Keith lacked any sort of apparent motive to accuse Garner falsely of shooting him; and (5) Garner, to this day, has yet to provide any sort of concrete and convincing evidence of an alibi outside of a single conclusory sentence in his 2010 Affidavit. Accordingly, given the overwhelming evidence of Garner's guilt, and the fact that he bears the prejudice burden, we do not believe that "[t]he likelihood . . . [is] substantial, [rather than] just conceivable," that the second 911 call, even if used affirmatively by Garner's counsel, would have created reasonable doubt about Garner's guilt in the mind of the jury. *See Richter*, 562 U.S. at 111–12 (emphasis added).[25]

---

[25] Before both the state court and the district court, Garner argued that his trial counsel could have also used the *first* 911 call to establish that the shooting occurred sometime between 10:31 p.m. and 10:41 p.m. Although a transcript of this call—which the prosecution told the jury took place at 10:40 p.m.—is not in the record, Garner insists that the individual on this call informed the 911 dispatcher that he had "just walked out" after hearing a loud noise, implying that the shooting could not have occurred more than a couple of minutes prior to the call. Affirmation in Answer, *Garner v. Lee*, No. 2:11-cv-00007-PKC (E.D.N.Y. Mar. 10, 2011), ECF No. 10-2 at 38. But even assuming *arguendo* that Garner has accurately characterized the contents of this call, we do not believe that such an offhanded remark by a 911 caller (*i.e.*, "just walked out") is sufficient to outweigh

* * *

To reiterate, to establish prejudice Garner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The likelihood of a different result must be "substantial." *Richter*, 562 U.S. at 112. Fatal to Garner's claim, there is simply no basis here for concluding that he has established anything close to a *substantial likelihood* of a different result, even if his attorney had obtained the phone records in question prior to trial. The district court erred in concluding otherwise.

With respect to Garner's (1) six other grounds for relief based on trial counsel's alleged ineffective assistance, and (2) due process and fair trial argument, we do not address them here because the district court did not consider them below. *Cf. DiSimone v. Phillips*, 461 F.3d 181, 198 (2d Cir. 2006) (remanding habeas case for consideration of a question that had "not to date been the focus of attention in the courts that . . . reviewed [the petitioner's] case"). We therefore

---

the overwhelming evidence of Garner's guilt. That is especially so given that *the prosecution played this 911 call for the jury*, *told the jury that the call occurred at 10:40 p.m.*, and nonetheless still maintained to the jury (ostensibly successfully) that Garner shot Keith at approximately 10:25 p.m. *See also* App. at 227 ("[The first 911 caller] doesn't say this immediately happened before me. . . . He doesn't say for how long or from where he comes upon the body [and] he calls the police.").

61

remand so that the district court may consider the remaining aspects of Garner's claims in the first instance, consistent with the analysis herein.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's grant of Garner's petition for a writ of habeas corpus and REMAND the case for further proceedings consistent with this opinion.